UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

James Reinholdt, Jr.,

                Plaintiff,

  vs.                        REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

          Defendant.        Civ. No. 05-2434 (PJS/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405j(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions

for Summary Judgment.  The Plaintiff has appeared by Jennifer G. Mrozik, Esq., and

the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion for Summary

Judgment be granted, and that the Plaintiff's Motion for Summary Judgment be denied.

## II.  Procedural History

The Plaintiff first applied for DIB on March 29, 2001, at which time, he alleged that he had become disabled on September 25, 2000.  [T. 30].  His claims were denied upon initial review, and upon reconsideration.  Id.  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on September 12, 2002, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by counsel.[1]  Id.  Thereafter, on November 4, 2002 , the ALJ issued a decision which denied the Plaintiff's claim for benefits.  Id.  The Plaintiff requested an Administrative Review before the Appeals Council which, on August 22, 2003, denied the claim for review.  [T. 17].

On January 23, 2003, the Plaintiff, who remained insured through December 31, 2004, [T. 49], filed a second application for DIB, alleging a disability onset date

---

[1]In the Record before us, the only documents pertaining to the 1993 application are the decision of the ALJ, [T. 27-46], the unfavorable Initial Determination, and the Reconsideration Disability Determinations of the State Agency, [T. 47-50].

of November 5, 2002.[2]  [T. 79-81].  The State Agency denied the claim on initial

review, and upon reconsideration. [T. 47-50].   On August 8, 2003, the Plaintiff

requested a Hearing before an ALJ, which was granted, and on April 8, 2004, a

Hearing was held, at which the Plaintiff appeared personally, and by counsel.  [T. 17,

474].  On November 4, 2004, the ALJ issued a decision affirming the Plaintiff's denial

of benefits.  [T. 17-24].  The Plaintiff requested an Administrative Hearing by the

Appeals Council on November 15, 2004, [T. 11-13], but that request was denied on

September 22, 2005.  [T. 6-8].  Thus, the ALJ's determination in the second claim

became the final decision of the Commissioner.  See, Grissom v. Barnhart, 416 F.3d

834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson

v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

### III.  Administrative Record

A.    Factual Background.  At the time of the ALJ's decision, the Plaintiff was

forty-four (44) years old, had a college degree in business administration, and past

work experience as a courier, postal clerk, insurance sales agent, and fast food

manager. [T. 18, 31, 96].  The Plaintiff had a past history of alcohol abuse, but had

---

[2]Although the ALJ's decision states that the Plaintiff filed his second
application on January 17, 2003, the Record reveals that the application was, in fact,
filed on January 23, 2003, and we adopt that date in our findings.  See, [T. 17, 79].

been sober since 1987. [T. 446]. His last work, as a courier, ended in September of 2000. [T. 81-96]. At the time that he applied for DIB, the Plaintiff was married, and had two (2) minor children, who were in the physical custody of his ex-wife, and two (2) stepchildren who lived with him and his second wife. [T. 79-81]. The Plaintiff was a veteran, having served in the United States Army from 1978-1983. [T. 79, 101, 471]. While in the Army, he was injured in an automobile accident, which also resulted in the death of an Army Chaplain, who was a passenger in the vehicle the Plaintiff was driving. [T. 446, 482]. The Plaintiff alleges that he cannot work due to depression, and post-traumatic stress disorder ("PTSD"). [T. 59, 64, 95].

The Plaintiff has received ongoing treatment for PTSD, and depression, at the Minneapolis Veterans' Administration Medical Center ("VA"), primarily in group therapy, and from Dr. Jose V. Pardo, his treating psychiatrist. [T. 97, 243, 445-47]. The Record discloses that, during the applicable time period, the Plaintiff's depression and PTSD symptoms fluctuated on a regular basis, with periods in which he reported being highly symptomatic, and others in which he advised that he felt that his symptoms were under control.

1.      The Records Dating Prior to November 5, 2002.

The Plaintiff was first hospitalized for depression in 1991, and in his records, he reported that he was subsequently hospitalized approximately every six (6) months, between 1991 and 2000, for a total of eight (8) or nine (9) inpatient hospitalizations, [T. 387], with the last hospitalization taking place in February of 2000. [T. 446]. In 1999, he made a suicide attempt by taking a bottle of sleeping pills, and then calling for help, id., and in January of 2000, the VA increased his rating for PTSD, which is considered part of his service-related disability, from 30% disabling, [T. 452-54], to a rating of 100% disabling. [T. 449-50, 463]. On December 29, 2000, the Plaintiff underwent a mental examination by Dr. S. Hossein Fatemi, who diagnosed him with depression and PTSD, and noted that the Plaintiff scored a fifty-five (55) on the Global Assessment of Functioning ("GAF") scale, indicating moderate symptoms.[3]  [T. 447].

---

[3]The Global Assessment of Functioning ("GAF") scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV-TR, at 34 (4th Ed. 2000). On the 100 point scale, a rating of between 71-80 indicates only slight impairment in social, occupational, or school functioning; a rating of between 61-70 suggests some difficulty, but "generally functioning pretty well;" a rating of between 51-60 indicates moderate symptoms or difficulties; and a rating of between 41-50 indicates serious and imparing symptoms. Id.

In October of 2000, the Plaintiff underwent a vocational assessment, and his physician advised that he needed to continue to manage his depressive symptoms with medication, and that it was important that he work with a vocational counselor in his job search, in order to find a job that would be low stress. [T. 181]. At that time, the Plaintiff noted that he was taking Buspirone[4] for his depression, and he reported no adverse effects. Id. He also reported that he was doing "better" than he had in the past, and that his symptoms were stable. [T. 183]. The Plaintiff informed his therapist that the symptoms, which were keeping him from working, were "concentration and memory," but he added that he felt that he could "learn to do almost anything," and that, with his management degree, there was not much that he could not do. [T. 184].

In November of 2000, he reported that his goal was to work, rather than to receive SSI, but he felt that he first had to get his depression under control. [T. 160]. The Plaintiff also told his therapist that he was trying to be more socially active, by engaging in karaoke singing, and church functions. [T. 164]. On November 9, 2000, the Plaintiff underwent vocational testing, which found that he was enterprising, and

---

[4]Buspirone hydrochloride is "used in the treatment of anti-anxiety disorders and for short-term relief of anxiety symptoms." Dorland's Illustrated Medical Dictionary, p. 257 (29th ed. 2000).

had a proclivity to business occupations, but was also sensitive, anxious, and depressed. [T. 156-57].

The Record reveals that, on January 3, 2001, the Plaintiff reported that he generally did not get depressed for more than one-half a day at a time, but that he was able to sleep only four (4) hours a night, and experienced heightened anxiety with any change, or with stress. [T. 321]. At that time, he was taking Venlafaxine,[5] Depakote,[6] and Buspirone, all of which he was tolerating well. Id. In a visit later in January of 2001, the attending physician noted that the Plaintiff was experiencing hand tremors, but that they had decreased since his last visit. [T. 320]. The assessor observed that the Plaintiff had benefitted from his therapy sessions, and had made significant changes for the better. Id. On January 29, 2001, the Plaintiff reported improvement in his mood, but stated that he continued to have difficulties negotiating interpersonal relationships. [T. 317]. In therapy notes from February 12, 2001, the Plaintiff stated

---

[5]Venlafaxine hydrochloride is "an inhibitor of serotonin and norepinephrine reuptake," and is used as an antidepressant. Dorland's Illustrated Medical Dictionary, p. 1953 (29th ed. 2000).

[6]Depakote is the brand name for divalproex sodium, which is "a stable co-ordination compound comprised of sodium valproate and valproic acid in a 1:1 molar relationship." The drug has been proven effective in the treatment of mania, migraine headaches, and epilepsy. Physician's Desk Reference, pp. 427-434 (61st ed. 2007).

that he was looking for work, and feeling anxiety about returning to work after months of unemployment.  [T. 314].

In that same  month, the Plaintiff called the VA reporting increased thoughts of suicide, but denying having any plan or active intent.  [T. 312].  He reported being concerned about money, and advised that he was considering looking for a position as an apartment caretaker.  Id.  On the following day, the Plaintiff reported that he planned to apply for a position as a delivery driver, and Dr. Pardo's nurse, Bruce R. Wurm, noted that he would ask Dr. Pardo for his recommendation.  [T. 310].

In March of 2001, the Plaintiff reported continued problems with interpersonal relationships and mood regulation. [T. 309].  He also stated that he had not actively been seeking employment, but was waiting until after a court appearance, which related to child support, and which was scheduled for the end of March of 2001, to begin looking for work.  [T. 305-07].  On March 31, 2001, the VA issued a disability Rating decision, that recorded that the Plaintiff's rating for PTSD was increased from 30% to 100%,  backdated to January 31, 2000, based on "a significant increase in the severity of psychiatric disability in the past year."  [T. 463].  The assessor noted that the Plaintiff had marked difficulty with anger management, chronic insomnia, impaired concentration, intrusive recollections of in-service trauma, flashbacks,

anniversary reactions, and other symptoms that were sufficiently severe that the VA found him unable to work. Id.

Despite that assessment, a report from April 2, 2001, noted that the Plaintiff continued to make improvements in his mood and behavior, [T. 304], and later, in April of 2001, the Plaintiff reported that he was feeling well enough to plan trips to New York, and to the south to visit friends. [T. 302]. After returning from New York in June of 2001, the Plaintiff expressed his intent to travel again, later in the summer, to visit people he had met on the internet, but he reported feelings of guilt about his lack of motivation. [T. 299]. On November 6, 2001, the Plaintiff noted that he was spending his time doing activities that he enjoyed, such as being with his children, reading, and doing cross word puzzles, [T. 278], and he announced his engagement to his fiancee at the end of November of 2001. [T. 272].

The Record from June of 2001, until January of 2002, reflects that the Plaintiff was relatively stabile, with periodic fluctuations in his mood, that were eased by a strong support system of family, friends, and his church. [T. 273, 278-98]. On January 2, 2002, the Plaintiff noted that he had been very busy planning for his wedding, which was scheduled for later that month, and that he was applying skills he learned in therapy to help him cope with stress. [T. 269]. At that time, he was

taking Venlafaxine, Depakote, Lithium,[7] and Buspar.  [T. 268].  On May 24, 2002, the

Plaintiff called in to the VA to cancel a therapy appointment, because he was going

to Iowa to help a friend tear down a barn, and his medical record noted that he

sounded "upbeat."  [T. 259].

In July of 2002, the Record reflects that the Plaintiff had not been filling his

medication prescriptions, and might have stopped taking his medications.  [T. 251].

On July 19, 2002, the Plaintiff confirmed that he had not been taking his medications,

but he indicated that he intended to resume taking them, as he had been experiencing

more depressive symptoms.  [T. 250].  A diagnosis on September 25, 2002, ruled out

bipolar disorder as a diagnosis, finding that the Plaintiff suffered from a recurrent

major depressive disorder.  [T. 245].

> 2.     The Records Dating After November 5, 2002.

On November 12, 2002, the Plaintiff called the VA to report that

things had started "turning bad" in the past two (2) weeks, and that he was

experiencing new symptoms of depression, including irritability and anger.  [T. 243].

---

[7]Lithium is "used in the treatment of acute manic states and in the prophylaxis of recurrent affective disorders manifested by depression or mania only, or those in which both mania and depression occur occasionally." Dorland's Illustrated Medical Dictionary, p. 1019 (29th ed. 2000).

He also reported having suicidal thoughts, but not ideas, and he stated that he was taking his medications regularly.  Id.  Dr. Pardo recommended that the Plaintiff increase therapy to improve his coping skills.  Id.  The Plaintiff called again on November 14, 2002, and claimed to be doing much better. [T. 241-42].   An assessment made on November 27, 2002, confirmed that the Plaintiff suffered from depression, and ruled out a diagnosis of a personality disorder.  Id.  At that time, the Plaintiff told Dr. Pardo that he was experiencing approximately "60% bad days and 40% good days," with his symptoms interfering with his functioning on about one-half of the bad days. [T. 241].   Dr. Pardo found him to have no loosening of association, had sensory and intellectual functions grossly intact, and had fair insight and judgment. [T. 242].  On the same visit, the Plaintiff's social worker noted that he was "stable and has the skills for successful living."  [T. 241].

On January 15, 2003, the Plaintiff reported feeling well, and advised that his new wife helped him cope with his depression better than he had in the past.  [T. 399]. On March 12, 2003, the Plaintiff reported that he felt better, following a recent bout of depression, and noted that he found his internet support system to be helpful. [T. 396].  The Plaintiff's social worker felt that the Plaintiff was stable, but needed to work on handling stress better.  Id.

- 11 -

On March 20, 2003, Dr. Alford Karayusuf performed a consultative psychiatric examination of the Plaintiff.  [T. 238-41].  Dr. Karayusuf had no medical records available for his assessment of the Plaintiff, but the Plaintiff informed him that his chief complaint was chronic depressive episodes that negatively affected his concentration, and gave rise to irritation and hostility to others. [T. 238].  The Plaintiff reported not having been hospitalized in the past three (3) years, which he attributed to his current combination of medications. [T. 339].  He noted that his moods still fluctuated, but not to the extent that they had in the previous year, although he still struggled with feelings of depression, and recurring and fleeting suicidal thoughts.  Id.  The Plaintiff advised that he had sleep difficulties, fluctuating appetite, low concentration and memory, and low self-esteem.  Id.  Dr. Karayusuf made a provisional diagnosis of bipolar disorder, and concluded that the Plaintiff was able to understand, retain, and follow simple instructions, and was restricted to work that involved brief, superficial interaction with fellow workers, supervisors, and the public.  [T. 341].  He found that, in the context of performing simple, routine, repetitive, concrete, and tangible tasks, the Plaintiff was able to maintain pace and persistence.  Id.

On March 23, 2003, the Plaintiff reported severe chest pressure in the night, that radiated to his left shoulder. [T. 396].   He had a stress test and an EKG that were inconclusive, and he was released for future monitoring without a diagnosis. [T. 382, 364-65].  On March 25, 2003, he saw Dr. Pardo, and was given a GAF score of 65, indicating mild symptoms. [T. 398].  He was again diagnosed with depression and PTSD, which were evidenced by a depressed mood, sleep disturbance, and feelings of guilt. [T. 397].  An assessment of the Plaintiff on April 9, 2003, concluded that his fluctuating moods were due in part to "poor medication compliance," as he admitted that he was missing his medications as often as one-third of the time.  [T. 277]. Despite the mood swings, he reported handling his anger better than he had in the past, and stated that he was looking forward to going camping with his wife and children in the summer. [T. 276].  The report noted that, while the Plaintiff's concentration was "low," he had been reading more lately.  Id.  On June 25, 2003, the Plaintiff said that his mood was somewhat better, although he still felt angry and irritable, and was worried about the impact of his depression on his marriage. [T. 270].  The results of his mental status exam were unchanged.  Id.

On July 12, 2003, the Plaintiff reported feeling highly stressed, which he suggested was caused by living with his blended family in cramped conditions.  [T.

441].  The Plaintiff's social worker assessed his PTSD level on July 29, 2003, as moderate, and noted that the Plaintiff was hoping to move out of the city in the belief that this would decrease his stress.  Id.  On August 18, 2003, the Plaintiff reported being "very excited" at the prospect of moving from St. Paul to a house in Litchfield, Minnesota, which would afford his family more room and, he felt, would decrease his daily stress.  [T. 440].  In a visit on September 9, 2003, the Plaintiff denied any symptoms of depression, or any other complaints.  [T. 436].  Between November 18, 2003, and January 9, 2004, the Plaintiff reported doing "fairly well," despite experiencing stress relating to his teenage son's drug use, and possible diagnosis of bi-polar disorder.  [T. 435-36].  Dr. Pardo again ruled out bipolar disorder in the Plaintiff at a visit on January 7, 2004, and also noted that the Plaintiff was well groomed, logical, and had fair insight and judgment.  [T. 435].

On April 13, 2004, Dr. Pardo completed a medical assessment of the Plaintiff's ability to perform work-related mental activities.  [T. 464-66].  He stated that the Plaintiff had a fair ability to follow work rules, relate to supervisors, co-workers, and the public, and function independently, and a poor ability to use judgment, deal with work stress, and maintain attention and concentration.  [T. 464-65].  Dr. Pardo noted that the Plaintiff had experienced multiple hospitalizations while he was working but,

when he did not have to deal with work stressors he had stabilized, and experienced no hospitalizations. [T. 465]. Dr. Pardo opined that the Plaintiff had a fair ability to understand, remember, and carry out simple job instructions, but a poor ability to cope with detailed or complex instructions. Id. Dr. Pardo found that the Plaintiff's ability to make social adjustments was poor, and that the Plaintiff had a "history of noncompliance with treatment because of [the] severity and chronicity of [his] illness." [T. 465-66].

On May 20, 2004, the VA continued the Plaintiff's 100% disability rating based on PTSD. [T. 471-72].[8]   The VA report cited a recent onset of violent thoughts resulting in a medication adjustment, and weekly anger management sessions, while noting that the Plaintiff expressed no desire to act on his violent thoughts. Id. The VA report also noted that the Plaintiff became irritable when depressed, and isolated himself. Id. The report noted weekly trauma-related nightmares, memories of trauma that interfered with concentration, and ongoing guilt related to the trauma, and expressed the view that the Plaintiff's condition had not improved. Id.

---

[8]The VA provides an assessment of 100% disability whenever there is evidence of "total occupational and social impairment." [T. 472].

B.   <u>Hearing Testimony</u>.   The Hearing, which took place on April 8, 2004,

commenced with some opening remarks from the ALJ.  [T. 476-77].  The Plaintiff

was represented at the Hearing, and his attorney did not object to any of the evidence

in the Record, and did not have any additional documents to add.  [T. 477].  The ALJ

then explained that the Plaintiff had previously filed an application for DIB on March

29, 2001, that the application had been denied by the State Agency, and that the denial

was affirmed by the ALJ on November 4, 2002.  [T. 477].  The ALJ explained that he

intended to use November 5, 2002, which is the day following the decision which

denied the Plaintiff's first request for DIB, as the alleged onset date for the current

Hearing. [T. 478].

The Plaintiff's attorney then made a few preliminary remarks.  <u>Id.</u>  She stated

that the Plaintiff was alleging disability based on depression, or bipolar disorder, and

also PTSD.   <u>Id.</u>   The Plaintiff's attorney asserted that the Plaintiff's condition

fluctuated, with some periods when he acknowledged feeling better, and others when

he suffered from interrupted sleep and suicidal thoughts.  <u>Id.</u>  She explained that the

Plaintiff also had periods in which he felt tired and had trouble concentrating, with the

bad days outnumbering the good days "60 percent * * * to 40 percent." [T. 479].  The

Plaintiff's attorney cited a rating decision, reached by the VA in 2001, that evaluated

- 16 -

the Plaintiff as "100 percent disabling" and, while she admitted that the rating was not controlling, she argued that the ALJ should give that rating significant weight.  Id. The Plaintiff had not yet received a copy of the VA rating decision, but represented that he would submit it, post-Hearing, if the ALJ felt that it was necessary.  Id.

The ALJ then swore the Plaintiff to testify.  Id.  The Plaintiff identified himself, explained that he was forty-three (43) years old, and had moved from St. Paul to Litchfield at the end of August of 2003.  Id.  The Plaintiff told the ALJ that he and his wife had become tired of living in St. Paul, and thought that they would have a better life for themselves, and their children, if they moved to a smaller town. [T. 480].  The ALJ established that the Plaintiff was 5'10" tall, and weighed two hundred and fifty (250) pounds.  Id.  The ALJ next asked the Plaintiff about his current living situation. Id.  The Plaintiff replied that he lived in a single family house, with his wife and three (3) children.  Id.  He reported that his wife worked full time in Litchfield, and also sold dresses and collectibles out of the family home.  Id.  The Plaintiff's sixteen (16) year old son had been living with him but, since March 5, 2004, was residing at the Kandiyohi County Boys Home, and was undergoing treatment at the Cardinal Recovery Center.  Id.  The Plaintiff added that he had two (2) step-daughters with his current wife, ages thirteen (13) and fifteen (15), who also lived with them.  Id.  The

Plaintiff testified that he expected his son to remain in custody for thirteen (13) weeks, but that, because he had been very resistant to treatment, he might remain in custody for a longer period. [T. 482].  The Plaintiff testified that his stepdaughters were both in school, and rode the school bus.  Id.

The ALJ then turned his questions to the VA benefits that the Plaintiff received. Id.  The Plaintiff explained that, although he had been receiving VA benefits for some time, his benefits had only gone up to 100% in January of 2000.  Id.  The ALJ asked about the basis for that increase, and the Plaintiff responded that the cause was PTSD, which arose from an automobile accident on October 8, 1981, in which the Plaintiff was driving and his passenger, an officer, was killed.  Id.  The Plaintiff explained that the accident took place around the same time that he was  separated, then divorced, from his first wife, and he added that the only other thing he could remember, from that period, was a "history of hospitalizations over the last nine years of about every six months with suicidal thoughts of depression."  [T. 483].  The Plaintiff offered to provide the ALJ a copy of the VA's recent rating decision, and the ALJ stated that he would like to see it.  Id.  The ALJ asked the Plaintiff if he knew when the decision had been issued, and the Plaintiff replied that he believed it had been issued in March of 2001, but that was back-dated to January of 2000.  Id.  The ALJ asked the Plaintiff

- 18 -

how much money he received from the VA, and the Plaintiff explained that, prior to the decision in January of 2000, he had received $2,632.00 a month, but that sum had increased to $2,653.00, upon the finding of total disability.  Id.

Next, the ALJ asked the Plaintiff when he had last worked.  [T. 484].  He testified that the last time he had worked was September 13, 2000, when he had served as a courier for Silver Bullet Delivery Service.  Id.  The ALJ asked why that job had stopped.  Id.  The Plaintiff explained that he had gone into the VA Hospital, to the Partial Psychiatric Hospitalization ("PPH") clinic, in order to discuss his PTSD, and the medications that he took for its management, as well as his troubling feelings at work that if he was not "perfect," he would "eat  myself up inside," and then do no work at all.  Id.  The doctor told the Plaintiff that he should not drive for a living, because "the cost of making a mistake behind the wheel when you're driving 300 to 500 miles a day is a lot more expensive than the cost of misfiling a paper somewhere as a clerk."  Id.  The ALJ then asked the Plaintiff if he looked for a job that involved filing papers, [T. 484], and the Plaintiff responded that he had worked with a vocational rehabilitation specialist, but had been unable to find a position that worked for him.  [T. 485].

The ALJ asked the Plaintiff why he had not tried another job, after he stopped being a courier.  Id.  The Plaintiff testified that one of the doctors on his mood team, Dr. Pardo, had instructed him not to seek work, id., because it would be "counter productive" when he still needed "intensive therapy * * * to get a hold of the depression."  [T. 486].  The Plaintiff explained that the "intensive therapy" was ongoing, and he was seeing his social worker once a week, and Dr. Pardo every three (3) months for medication management, along with Dr. Pardo's nurse every two (2) months to "touch base."  Id.  The Plaintiff testified that he was currently taking Effexor, Buspar, Lithium, Depakote, Simvastatin, Metoprolol, Lisinopril, and aspirin, and had been taking those medications since 2000.[9]  [T. 486-87].

---

[9]Effexor "is indicated for the treatment of major depressive disorder." Physicians' Desk Reference, at p. 3412 (61st ed. 2007).

Simvastatin is "an antihyperlipidemic agent" that is "used to lower blood lipid levels in hypercholesterolemia."  Dorland's Illustrated Medical Dictionary, p. 1646 (29th ed. 2000).

Metoprolol is "indicated for the treatment of hypertension." Physician's Desk Reference, p. 2238-39 (61st ed. 2007).

Lisinopril is "used in the treatment of hypertension, congestive heart failure, and acute myocardial infarction."  Dorland's Illustrated Medical Dictionary, p. 1019 (29th ed. 2000).

The ALJ then turned to the Plaintiff's emotional condition. [T. 487]. He asked the Plaintiff about evidence in the file that he sometimes appeared to be doing well, and would go to the doctor and report that he did not have any problems. Id. The Plaintiff explained that, at one point in January of 2003, immediately after being remarried, he felt that things were going well for him, and that he also had other good days. Id. However, he added that the last two (2) weeks had not been good. [T. 488]. The ALJ asked if the Plaintiff's mood could change from day to day, and the Plaintiff stated that his mood and his drive varied, depending, at least in part, on external factors. Id.

The Plaintiff explained that the doctors at the VA hospital had taught him to monitor his moods, "like a diabetic monitors their blood sugar," and, as a result, he would give himself a rating of one (1) to ten (10) every day, so that he could know if he was having trouble concentrating or not eating or sleeping well. Id. He added that he discussed his symptoms with his wife, telling her "looks like we're having [sic] down into a depression," and when that happened then all he could do was take his medications and "hang on." Id. The ALJ asked the Plaintiff when he was last hospitalized for depression, or any psychological condition, and he replied that, while he had last been hospitalized in February of 2000, his new medical team had recently

- 21 -

discussed hospitalization, as the situation with his son, which had been pending since October of 2003, had been overwhelming, and he had developed new symptoms.  [T. 488-89].

The ALJ then turned to the Plaintiff's daily life.  <u>Id.</u>  The Plaintiff testified that his wife worked mostly during the day, and a few evenings.  <u>Id.</u>  The ALJ asked if the Plaintiff got himself up in the morning, and got cleaned up and dressed, <u>id.</u>, and the Plaintiff replied that "some mornings I do, some I don't."  [T. 490].  He stated that, when his wife was at work, he would like to help around the house and, on good days, he would have "flurries of activity," but that some days he could not lift himself from the couch.  <u>Id.</u>  The ALJ said, "I hear you using the word 'can't,'" and the Plaintiff explained that he had no drive to get up, even though he knew it would be helpful and that it needed to be done.  <u>Id.</u>  He explained that when he could not get up, he would watch television, check his email on the computer and, if he felt that his concentration was sufficient, he would attempt to read or do crossword puzzles.  <u>Id.</u>

The Plaintiff testified that he did not smoke and, although he went to bed between 9:00 and 10:00 o'clock p.m. every night, he did not sleep well.  <u>Id.</u>  The ALJ asked if he had been prescribed any sleep aids, and he replied that he had not, but repeated that he took Effexor, Depakote, Buspar, Lithium, Simvastatin, Metroprolol,

and Lisinopril.  [T. 491].  When asked what he took on waking up, the Plaintiff explained that he took the Simvastatin and the Lisinopril only once a day, but that, in the morning, he also took an aspirin.  Id.  Despite going to bed at 9:00 o'clock or 10:00 o'clock p.m., the Plaintiff stated that he usually did not get to sleep until midnight, or 1:00 o'clock or 2:00 o'clock a.m., and that he woke up at 7:00 o'clock or 8:00 o'clock  a.m.  [T. 491-92].  The ALJ asked if he mowed his lawn, and the Plaintiff responded that, when the lawn required it, he would mow it and have his children help him with it.  [T. 492].  He added that he found it "mindless" to push the mower around.  Id.  The ALJ asked the Plaintiff if he had been outside of Minnesota in the past couple of years.  Id.  The Plaintiff testified that the only trips that he took were to visit his mother, who lived in Des Moines.  Id.  He and his wife would share driving on the trips, which they took approximately every three (3) months.  [T. 493].

In response to the ALJ's question, as to whether he was talking to his treating professionals about any vocational endeavors or programs, the Plaintiff replied that he saw his social worker weekly, and that the last time the Plaintiff had spoken to him about his new symptoms, the social worker continued to recommend that the Plaintiff not work.  Id.  The ALJ then asked the Plaintiff about the "new symptoms" that he referenced, and the Plaintiff explained that one of the ways his depression had

historically expressed itself was through anger.  Id.  He described himself as "a big child throwing a temper tantrum" in response to something small that one of his children did.  Id.  However, he reported that, lately, he had been having thoughts about physically harming animals -- specifically the pets that he kept at home.  Id.  In addition, he testified that "one night laying in bed [he had] even been thinking about how easy it would be just, I had my hands around my wife just to choke her."  Id.  He described being frightened by those thoughts, which caused him to call his mood team at the VA, id., who made some adjustments to his medications and ordered some blood work.  [T. 494].  He was also working with his social worker on techniques to get rid of those new feelings.  Id.

The ALJ asked the Plaintiff if he ever had two (2) or three (3) days in a row where he felt that he could do a job, even for a short period of time.  Id.  The Plaintiff replied that the did not feel that he could "make any promises," because he felt that he had been trying to stabilize for the past ten (10) years.  Id.  The ALJ then asked the Plaintiff to think back over the past couple of years, and consider if he had ever had a period of several days, or a week in a row, when a job would have seemed possible.  Id.  The Plaintiff explained that he had felt that way in the past, and that things were not different for him today, but that he was unable to make a commitment to a job

when he was not sure what his mood was going to be from one day to the next.  Id. The ALJ confirmed that the Plaintiff's condition was essentially unchanged over the past couple of years, and the Plaintiff explained that his mood depended on what was going on in his life, and on how he felt physically. [T. 495].  According to the Plaintiff, sometimes the bad times lasted only one (1) day, sometimes only one (1) hour, and sometimes they lasted for two (2) weeks. Id.  The ALJ finished his examination of the Plaintiff by asking if he always took the medications that he was prescribed, and he affirmed that he did.  Id.

The ALJ then addressed the Plaintiff's attorney, and stated that he did not think there were any lifting, standing, or walking issues, that he understood there were some hypertension issues, but that, given the Plaintiff's age, he did not think that any exertional assessments would make a difference.  Id.  The Plaintiff's attorney agreed with the ALJ, and then began to examine the Plaintiff.  Id.  She started by asking if the Plaintiff had any side effects from his medications, and he replied that he had trembling in his hands that his doctors felt were probably from his medications, rather than from Parkinson's Disease. [T. 495-96].  He added that the shaking varied, being very mild on some days, while on one (1) out of every three (3) days, it was so severe

that it prevented him from holding soup in a spoon, and was noticeable to his wife. [T. 496].

The Plaintiff's attorney then asked if he had any difficulties with his concentration.  Id.  He testified that on some days, he could read and do crossword puzzles, but that at least a couple of times a week his concentration was so impaired that he was unable even to turn on a radio.  Id.  He explained that, in 2001 or 2002, he had earned his amateur radio license, which required a great deal of technical reading, but that at the time of the Hearing he had days in which he could not even remember how to tune a radio, which limited his enjoyment of that hobby.  Id.  The Plaintiff's attorney then asked him if he ever had feelings of guilt, and the Plaintiff replied that he felt guilty "all the time,"  id., which was brought on by knowing that he did not help around the house, while his wife worked hard for the family.  [T. 497].  He testified that he also felt guilty about not working and, most recently, about his son, even though it was not his choice that his son used drugs.  Id.

The Plaintiff's attorney asked him how his feelings of guilt manifested themselves.  Id.  The Plaintiff responded that, initially, he would withdraw and shut down and, when people intruded on his withdrawn state, his anger and rage would boil up, and he would insist on being alone.  Id.  Eventually, he would reach a point where

he would "blow up," and then feel even worse because he did not "have the right to blow up." Id. He would end up feeling ill, and guilty, and make concessions to the person who was the focus of the outrage, because he wanted to make up for his anger, which led to more feelings of guilt, and resolved itself into increasingly deeper depression cycles. Id. He added that monitoring his symptoms, with his wife's help, made a positive difference. Id.

The Plaintiff's attorney then asked if he ever did chores, such as going to the store. [T. 498]. He testified that he did not do shopping on his own, but that, on some days, he would go with his wife, even though he did not want to go, whereas on other days he would refuse to go. Id. In response to his attorney's question, the Plaintiff testified that he could go to the store about four (4) days a week, but the other three (3) days, he was unable to deal with people, as he was afraid that he would lose control in public, and "go off on somebody" verbally. Id. The Plaintiff added that he saw some relationship between the stress in his daily life and his symptoms, id., but that he woke up depressed on some days with no apparent explanation. [T. 499]. While in the past he had tried to figure out why he felt bad on some days and not others, he testified that he now just considered it part of his disease, and would just take his medications and "hang on." Id. He also reported being better about warning

- 27 -

his children and others when he was having a bad day, so that if he blew up at them, they knew it was not about them.  Id.

The Plaintiff's attorney asked him if his depression ever interfered with his ability to drive to Des Moines to see his mother.  Id.  He replied that it did, as he once was able to make the drive by himself, down and back, in one (1) day, but that, now, he had to stop two (2) to four (4) times and sleep.  Id.  He felt that some of this was due to his medications, but he also attributed it to his concentration problems, and explained that he succumbed to "highway hypnosis."  Id.  The Plaintiff added that, as a result of his PTSD, if he saw an accident, he had to pull to the side of the road to gather his thoughts.  Id. The Plaintiff's attorney also asked him about his difficulties sleeping.  Id.  He explained that he would lie awake in bed for a couple of hours, then sleep for twenty (20) or thirty (30) minutes, and then be awake for half an hour, even though nothing had awakened him.  [T. 499-500].  He added that he had a lot of dreams, with many of them involving being caught in hopeless situations, or situations in which he had to fail.  [T. 500].

The ALJ then resumed his questioning of the Plaintiff.  Id.  He asked the Plaintiff about his educational background, and the Plaintiff confirmed that he had a high school education, and a four (4) year college degree.  Id.  The ALJ asked about

the Plaintiff's church attendance, and noted that the Record indicated that, at one point, he used to attend church regularly, and played a guitar at the services. Id. The Plaintiff told the ALJ that he was a member of a church in Litchfield, which did not need his services as a guitarist, but that he attended regularly. Id. The ALJ asked the Plaintiff if church was an important part of his life, and he answered that it was, adding that, "without that spirituality to hang onto" he probably "would have been in the hospital long ago." [T. 500-501]. Finally, the ALJ asked the Plaintiff about his alcohol use. Id. He explained that he had not used alcohol for sixteen (16) years. Id.

The ALJ then asked the Plaintiff's attorney if she had any objections to the qualifications of the Medical Expert ("ME"), and she affirmed that she did not. Id. The ME was duly sworn, and testified that he had read the Record provided by the ALJ. Id. The ME asked the Plaintiff to confirm that the members of his current medical team were Drs. Pardo and Ansal, and that he also regularly saw a social worker, Pat Reinzinger. [T. 502]. The Plaintiff affirmed that this was correct, and added that he also saw a psychologist at the VA hospital. Id. The ME then asked the Plaintiff about the lack of any notes in the Record from any of the afore-mentioned experts, to the effect that the Plaintiff could not work. Id. The Plaintiff explained that he asked his doctors if he was capable of working "every time I go talk to them," but

that they all told him "sometime down the road," without any definite  answer.  [T. 502-03].

The ME then asked the Plaintiff if he had ever asked any of his support team to write a letter to Social Security, in  support of his statement that he did not feel that he could work.  [T. 503].  The Plaintiff admitted that he had not done so "directly," but that he had mentioned to them that he was applying for Social Security, and they had reassured him that they would do whatever they could do.  Id.  The ME repeated his question, asking the Plaintiff why he had not asked them to write him a letter of support, and the Plaintiff replied that it had never crossed his mind.  Id.

The ALJ then resumed questioning the ME.  Id.  The ALJ asked the ME to comment on any psychological impairments that he saw in the file, from November of 2002, until the present.  Id.  The ME testified that the Plaintiff had been diagnosed with major depressive disorder, and that, while there was no diagnosis of bipolar disorder in the Record, the Plaintiff had suggested that he was bipolar in the consultative examination, and the medications he had been prescribed reflected that his physicians felt that he was bipolar.  [T. 504].  The ME noted that the Plaintiff had at one time been diagnosed with a personality disorder, but that that had been ruled out in a subsequent record.  Id.  Finally, the ME noted a diagnosis of PTSD.  Id.  The

ALJ asked the ME to clarify if the Record supported a diagnosis of bipolar disorder, and the ME replied that he felt that the Record was more consistent with a standard depressive disorder, with some evaluations suggesting that the Plaintiff suffered from major depression, and others suggesting that he did not quite reach that level.  Id.  The ME stated that he did not see any clear evidence of bipolarity in the Record, such as a manic episode, or even a description of bipolar behavior.  Id.  The ME added that the irritability, which the Plaintiff experienced, was more consistent with a personality disorder than with bipolarity.  Id.

The ALJ then asked the ME about the Plaintiff's diagnosis of PTSD.  Id.  The ME explained that he found evidence of sleep disturbance, some decreased energy, feelings of guilt and worthlessness, some problems with concentration, and suicidal ideation, particularly in the more distant past.  [T. 505].  The ME added that there was nothing very specific in the Record about the pattern through which the Plaintiff's anxiety manifested itself, but that he had found some references to "minor obsessional kinds of thinking," or compulsive behavior, even though that had not been diagnosed.  Id.  Noting that there was very little discussion of PTSD, but that the VA had found the Plaintiff to be 100% disabled, the ALJ asked the Plaintiff's attorney if there was anything missing from the Record that would indicate a history of PTSD.  Id.  The

Plaintiff's attorney replied that the only medical note missing from the Record was the most recent VA Rating decision.  Id.  The ALJ explained that he would like to see that, so that he could understand the basis for the VA's decision, as there was no discussion of PTSD in the Record.  [T. 505-06].

The ALJ then asked the ME if he found a diagnosis of a personality disorder supported by the Record.  [T. 506].  The ME explained that he saw evidence of a pathological dependence, and persistent disturbance of mood and affect, and also some unstable interpersonal relationships, although the ME added that those had been primarily within his family, rather than in the larger community.  Id.  The ME noted that he found this to be a difficult case, because the testimony at the Hearing was "somewhat different from the * * * Record" and, if he were to go strictly by the Record, he would rate the Plaintiff "quite differently" than if he strictly followed the Hearing testimony.  Id.  The ALJ replied that he recognized that he had to consider the Hearing testimony, but that the testimony also had to be supported by the Record, which was why he had asked about the PTSD.  [T. 507].

The ALJ explained that he was concerned that the Plaintiff had an entire team of specialists, but nothing in the Record reflected that they had ever told the Plaintiff that he could not work, which he found  difficult to reconcile with the VA's decision

to suddenly rate the Plaintiff as 100 % disabled.  Id.  The ALJ asked the Plaintiff's attorney if she could write a letter to Dr. Pardo, to request full documentation as to what was going on with the Plaintiff.  Id.  The Plaintiff's attorney agreed, but explained that she had already sent a questionnaire to Dr. Pardo, and had difficulty tracking him down.  [T. 507-08].  The Plaintiff interrupted to state that he would be at the VA the following week, and would try to get a letter from a member of his team.  [T. 508].  The ALJ agreed to that plan, and stated that he felt that the Plaintiff did need to explain why his records "don't seem to talk about what he's talking about today."  Id.  The Plaintiff's attorney agreed that "a lot of the symptoms are not" on the Record.  [T. 509].  The ALJ concluded by telling the Plaintiff's attorney that he would leave the Record open, in order to allow the Plaintiff to provide additional information from his physicians.  [T. 510].

The ALJ then resumed his questioning of the ME, and asked him about the B criteria.  Id.  The ME replied that he would suggest a label of mild restriction of activities of daily living, as the Record suggested that the Plaintiff did not have not any significant problems.  [T. 510-11].  The ME explained that the Plaintiff spent a lot of time talking on the internet, reading, and taking trips, including a visit to New York two years ago.  [T. 511].  The ME found the Plaintiff to be moderately restricted

in social functioning, as he had a tendency to withdraw, but noted that the Record revealed that those withdrawals had not been as major as those that the Plaintiff had testified to at the Hearing.  Id.  Under maintaining concentration, persistence, and pace, the ME found that the Hearing testimony would suggest a finding of marked impairment, but the Record indicated only moderate restrictions.  Id.  Finally, the ME noted that there were no episodes of decompensation since November of 2002.  Id.

The ALJ interrupted the ME to ask if the Plaintiff would meet the listing "if every word," that the Plaintiff had uttered at the Hearing, were true.  Id.  The ME responded that, if that were the case, the Plaintiff would meet the Listing.  Id.  The ALJ then asked the ME, in the alternative, what his evaluation would be if he based his assessment solely on the Record.  Id.  The ME replied that, relying solely on the Record, he would find that the Plaintiff would be limited to tasks that were relatively simple to moderately complex, unskilled, or semiskilled tasks, with brief and superficial contact with coworkers and supervisors, and infrequent contact with the public.  [T. 512].  The ME explained that he felt that the Plaintiff could handle working around the public on a regular basis, but was concerned about his stress level if he had to comply with the public's directives, or work in a busy store.  Id.  The ME concluded that the Plaintiff needed to be in a low stress environment, or at least one

- 34 -

which had low pace and production, with few potentials for personal conflict, and not requiring a great deal of decision-making or judgment.  Id.  The ALJ asked the ME to confirm that those were his recommendations, for the period from November of 2002, until the date of the Hearing, and the ME acknowledged that they were.  Id.

The ALJ then asked the Plaintiff's attorney if she had any questions for the ME. Id.  She asked the ME if it were possible to infer a diagnosis of PTSD, from the medications that the Plaintiff had been prescribed, such as Lithium or Depakote, as the ME had for the bipolar disorder.  [T. 512-13].  The ME explained that the prescriptions for those drugs could be used to address complaints of mood swings, or to serve as a general mood stabilizer, without a diagnosis of bipolar depression.  [T. 513].  The Plaintiff's attorney then asked if the ME could arrive at a diagnosis of PTSD from the events, which had happened in the past, and the ME responded that, generally, if PTSD was not listed in the records, it was because the physicians did not consider the symptoms significant, as usually the treatment concentrated on reducing the number of PTSD symptoms.  Id.  The ME reiterated that he did not see many PTSD symptoms described in the Plaintiff's daily functioning, as documented in the Record, which suggested that his doctors were not treating those symptoms.  Id.  The ME added that any of the medications, which the Plaintiff was being prescribed, could

be used for the treatment of PTSD, and noted that Buspar is an anxiety medication sometimes prescribed for PTSD, although it was more often used in generalized anxiety conditions, or phobias.  Id.

The ALJ then asked the Plaintiff's attorney if she had any objections to the Vocational Expert's ("VE's") qualifications, and she replied that she did not.  [T. 514].  The VE testified that she was familiar with jobs existing in the region of Minnesota.  Id.  The VE started by asking the Plaintiff to clarify, if the 100% rating from the VA was based on employability, or on payment status.  Id.  The Plaintiff replied that, to his understanding, there was no difference between the two categories, and that the notices he received from the VA only advised that his disability was "100 percent service connected."  Id.  The VE explained that, at one point, the VA used to differentiate between disability, and employability, in assessing a veteran's Rating status, and the ALJ told the VE that he had seen those two (2) designations in the past, but that he did not believe that the VA had continued that practice.  [T. 514-15]. The Plaintiff then added that the only distinction made by the VA, of which he was aware, was between mental illness, which "has a chance of getting better," and paralysis or loss of limbs, which would not continued to be reviewed, as the disability would be complete and irreparable.  Id.

- 36 -

The VE then testified that she had no other questions, as the Plaintiff's work history was clearly reflected in the Record.   [T. 516].   The ALJ then posed a hypothetical to the VE, which asked her to assume a man in his early forties, with a high school and college education, and work experience as reflected in the Record. Id.  The hypothetical individual was impaired by an affective disorder, PTSD, and suffered from obesity, hypertension, and a personality disorder.  [T. 516-17].[10]  The hypothetical person took medications that caused some occasional trembling in his hands.  [T. 517].  The VE was told to give the hypothetical person a full range of light work, with the restrictions for no fine detail work, a job that was simple and unskilled, only brief and superficial contacts with coworkers, supervisors, and the public, and low to moderate stress.  Id.  The individual would not be expected to engage in high production quota work, or rapid assembly line work.  Id.

The ALJ then asked the VE if the hypothetical individual would be capable of performing the past relevant work of the Plaintiff.  Id.  The VE replied that he would be able to perform the Plaintiff's past work as a postal clerk, because that was a light,

[10]The ALJ then noted, as an aside, that, following the testimony of the ME, it was difficult to know if the Record supported a hypothetical in which the individual suffered from major depression, and a bipolar diagnosis, or had an affective disorder, but he resolved the issue by including the affective disorder in his hypothetical.  [T. 517].

unskilled job, and fit the non-exertional level that the ALJ had set forth in his hypothetical.  Id.  The VE explained that, as a postal clerk, the Plaintiff would be seated for seven (7) hours of the work day, with only one (1) hour of walking, and would never have to lift over ten (10) pounds.  Id.  The VE stated that there were 3,920 such jobs in Minnesota.  [T. 517-18].

The VE added that, if the Plaintiff chose not to return to that type of work, because he found the postal clerk position stressful, he also had a lot of relevant clerical experience.  [T. 518].  The VE noted that, in the past, the Plaintiff had worked as an insurance sales agent, and had computer knowledge, so he would be able to perform unskilled general clerical work, of which there were 75,040 general office clerk positions in Minnesota, with 18,500 positions, or twenty-five (25) percent, at the light unskilled level, involving collating, filing, copying, and other basic clerical skills.  Id.

Alternatively, if the Plaintiff found those positions too stressful, the VE suggested that he could perform the most basic type of assembly, such as inspecting and packaging, which are "the easiest jobs in the national economy."  Id.  The VE concluded that the hypothetical individual had many choices of employment, and noted that she was not even suggesting transferrable skills that he might also have, but

was concentrating on past work experiences. Id. The ALJ then asked the VE if, due to regular exacerbations in the hypothetical individual's psychological condition, he had to leave work significantly early one (1) day a week, or decided that he could not work one (1) day a week, there would be any employment he could do. Id. The VE replied that there would be no employment on the competitive level for that individual. Id.

The Plaintiff's attorney then asked the VE if, with the hypothetical posed by the ALJ that focused on simple, unskilled jobs at low to moderate stress, those jobs were likely to tolerate an unreliability rate of even twice a month. [T. 519]. The VE replied that, if an individual were otherwise performing well, and kept his absences down to two (2) times a month, it would be possible to sustain employment. Id. On the other hand, the VE testified that, if the person did not get along well with others, caused trouble at work, produced low quality work, and was missing two (2) days of work a month, then it would be difficult to hold a job. Id. The Plaintiff's attorney asked if, in the first case, everything else would have to be perfect, in order for the hypothetical individual to be able to keep his job with two (2) absences a month. Id. The VE replied that it would not have to be "perfect," but just reasonable, and that the worker could not just miss work and fail to call in to report his absence. Id.

- 39 -

The ALJ then concluded by reiterating his request to the Plaintiff to try to obtain any additional information, from his physicians, concerning his ability to work, together with the VA Rating decision, with a deadline set for three (3) weeks, and stated that he might forward any material, that he received, to the ME. [T. 520]. The ALJ then adjourned the Hearing. [T. 521].

C.     The ALJ's Decision. The ALJ issued his decision on November 4, 2004. [T. 17-24]. As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520.[11]   As a threshold

---

[11]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his

matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 5, 2002.  [T. 18].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  Id.  After considering the Plaintiff's medical history, including the reports of the Plaintiff's treating physician, and the testimony of the ME at the Hearing, as well as the summary of the Plaintiff's mental impairment history discussed in the previous ALJ decision that was issued on November 4, 2002, [T. 30-39], the ALJ explicitly adopted the testimony of the ME, and found that the Plaintiff was severely impaired by major depression, an anxiety-related disorder in the form of PTSD, and a personality disorder.  [T. 19].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d).  The ALJ determined that the Plaintiff's mental impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony of the ME, and the Record as a whole.  Id.  He found that the Plaintiff experienced

---

impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

mild restrictions of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace, with no evidence of decompensation, or any of the "C" criteria of Section 12.00. Id. The ALJ noted that the Plaintiff assumed many of the primary parenting responsibilities for his teenaged stepchildren, and maintained good relationships with his biological children. Id. His daily activities included playing computer and video games for approximately two (2) hours a day, walking his dogs, occasionally operating a ham radio, talking to friends on the phone, watching television, reading, doing crossword puzzles, checking his email, and playing a guitar. Id. The Plaintiff also traveled to Des Moines several times a year to visit his mother, and the Plaintiff's wife had suggested that his failure to do many household chores was due to forgetfulness, and lack of concentration. Id.

The ALJ accepted the testimony of the Plaintiff, and his wife, that, when he was in a depressive cycle, he would spend most of the day in bed and be irritable over little things, and noted that the Record, which disclosed that he attended group therapy for mood swings and irritation, corroborated that testimony. Id. However, the ALJ also noted that the report of a consulting psychologist, Dr. Karayusuf, found that the Plaintiff's concentration was good, with no obvious mental impairment. Id. As a

consequence, the ALJ determined that the Plaintiff had only mild to moderate functional limitations, that resulted from his mental impairments.  Id.

The ALJ then considered the Plaintiff's physical impairments, and found that he was severely disabled by obesity and hypertension, but that those impairments also did not satisfy the Listing criteria.  [T. 19-20].  The ALJ considered that the Plaintiff was hospitalized in March of 2003, but found that a thorough cardiac work-up was negative for heart-related etiology.  Id.  The Record contained evidence that the Plaintiff's blood pressure was elevated, but also revealed that the only result of his hospitalization was his subsequent release with increased dosages of hypertension medications.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  The term RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the

- 43 -

symptoms, including the Plaintiff's subjective complaints of pain, and that those

complaints were to be evaluated under the standard announced in Polaski v. Heckler,

739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the

Hearing; the opinions of the Plaintiff's treating physicians; the reports of Drs. Felling

and Karayusuf; the opinions of the impartial ME; the objective medical evidence; and

the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC

to be as follows:

> [The Plaintiff] retains the residual functional capacity for
> light work involving lifting 20 pounds occasionally and 10
> pounds frequently, sitting six hours and walking and/or
> standing six hours in an eight hour workday, no fine detail
> work with the hands, work that is simple and unskilled, and
> that requires only brief and superficial contacts with
> supervisors, coworkers, and the public, and involves only
> low to moderate stress levels.

[T. 20].

The ALJ concluded that such an RFC was consistent with the substantial weight of the

Record, but was inconsistent with the Plaintiff's assertion that he had been disabled,

by his mental impairments, from all work activity since November 5, 2002.  Id.

However, the ALJ noted that he had included the exertional limitations in the RFC in

order to accommodate the Plaintiff's physical conditions of obesity and hypertension, as well as his complaints of fatigue arising from depression.  Id.

In determining the Plaintiff's RFC, the ALJ gave the testimony of the ME significant weight, and found that his opinion, that the Plaintiff had substantial work-limitations, but was not precluded from all gainful employment, was supported by the testimony of Dr. Karayusuf and the State Agency psychological consultants, and the Record as a whole.  Id.  The ALJ noted that the Record demonstrated that, since the fall of 2002, the Plaintiff experienced mood swings, but that he remained functional. Id.  The ALJ observed that, on September 9, 2002, the Plaintiff told his social worker that his mood was stable, that he only experienced depressive symptoms about half of the time, and that he was using skills, that he had learned in therapy, to deal with those episodes of depression.  Id.

The ALJ also observed that the Record supported the Plaintiff's assertion, that his symptoms worsened when he was under stress, as in November of 2002, when his first Social Security DIB claim was denied, but that, by later that same month, he had reported that he was coping better.  Id.  The ALJ found that the Plaintiff reacted to major disruptions in his household, such as blending families with his second wife, having a son in drug treatment, financial problems, and a major relocation of the

- 45 -

household, with sleep disruption, irritability, and diminished energy and concentration. Id. The Record disclosed that, in June of 2003, Dr. Pardo spoke with the Plaintiff about the possibility of day treatment so as to address his increased symptoms, but the Plaintiff managed this stress without an increase in medication or treatment, and a few weeks later, he reported feeling much better. [T. 20-21]. The ALJ found it significant that the Plaintiff had not been psychiatrically hospitalized, at any point during the relevant time period, but added that he had accommodated the Plaintiff's increased symptoms under stress, by limiting his RFC to work involving only low to moderate stress levels. [T. 21].

The ALJ also considered the Plaintiff's complaints of irritability, that were noted in his VA mental health records, and that were addressed in his group therapy sessions. Id. The ALJ found that, while the Plaintiff clearly had an anger problem, he saw no evidence in the Record that would indicate that the problem manifested itself in physical or mental abuse toward the Plaintiff's wife or children, or that his mood instability caused problems in superficial interactions with the community, such as shopping for food or going to church. Id. For that reason, the ALJ reduced the Plaintiff's RFC to include no more than brief and superficial contact with co-workers, supervisors, and the public. Id. The ALJ gave little weight to the Plaintiff's

testimony, that he recently had been troubled by thoughts of harming animals, and his family, as there was no evidence in the Record that he discussed those symptoms with his physician, or sought treatment for them.  Id.

The Plaintiff has a college degree, and has performed skilled work in the past, but the ALJ limited his RFC to simple unskilled work in order to accommodate any limitations that the Plaintiff experienced from difficulties in concentration.  Id.  The ALJ noted that, although the Plaintiff reported experiencing both manic and depressive episodes, as well as panic attacks, his medical records disclosed that his medications were beneficial in stabilizing his mood.  Id.

The ALJ also found some evidence of noncompliance in the Record.  Id.  In April of 2003, the Plaintiff reported feeling much better after beginning regular treatment at the VA, but admitted that he missed his medications up to one-third of the time.  Id.  Dr. Pardo advised the Plaintiff that his mood fluctuations would stabilize even more if he were more compliant with his medication schedule.  Id.  By September of 2003, the Plaintiff reported that he was taking his medications as prescribed, and denied any depressive symptoms or side effects.  Id.  While the ALJ acknowledged that the Plaintiff testified to a tremor in his hands as a result of his medications, he did not find the complaint to be supported in the Record but,

nonetheless, he included it in his RFC, by precluding jobs involving fine detail work.
Id.

The ALJ then considered the VA's Rating decision of 100% service-connected disability as a result of PTSD. [T. 22].   The ALJ noted that Social Security Regulations provide that the determination of another governmental agency, concerning disability, are not binding on the ALJ and, while he did not adopt the findings of the VA rating decision, he did consider the evidence that was produced, as a result of the Plaintiff's treatment at the VA, and he relied on it for his ultimate determination.  Id.  While giving credence to the VA records, which showed that the Plaintiff had mental impairments that resulted in mood swings, irritability, and diminished tolerance for stress, and reducing the RFC accordingly, the ALJ did not find Dr. Pardo's assertion, that the Plaintiff had "no useful ability to function" in the areas of judgment, ability to tolerate stress, or maintain attention or concentration, to be supported by the Record.  Id.

The ALJ noted that, as the responsible parent, and stepparent, to several teenaged children, the Plaintiff had to make appropriate judgments on a daily basis.
Id.  The Plaintiff also had  negotiated the sale of his home, and purchased and moved his family to another home, in an effort to reduce his financial constraints, which the

ALJ considered as an indicator of good judgment.  Id.  The ALJ did reduce the Plaintiff's RFC, in order to reflect decreased ability in each of several areas, but based on the Record, and on Dr. Karayusuf's assessment, he found no evidence that the Plaintiff was completely unable to concentrate, or maintain the attention necessary for unskilled work.  Id.  In addition, the Plaintiff testified that he engaged in several activities daily, such as using a computer and e-mail, playing guitar, and driving a car, which required, at least, a modicum of concentration and attention.  Id.  Thus, the ALJ determined that Dr. Pardo's conclusions were unsupported by the Record as a whole, and he afforded them little weight.  Id.

Finally, the ALJ considered the Plaintiff's motivation in applying for Social Security benefits, including his testimony that he received $2,653.00 per month in VA disability benefits.  Id.  The ALJ noted that those payments were likely to diminish the Plaintiff's desire to work.  Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, that the Plaintiff's past relevant work, as a postal clerk, did not require the performance of work-related activities which were precluded by the Plaintiff's RFC, and that, therefore, the Plaintiff could still perform his past relevant work as a courier, postal clerk, insurance sales agent, or fast food manager.  [T. 23].

- 49 -

At Step Five,  the ALJ noted that the final step was to determine whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience.  Id.  The ALJ expressly noted that the burden of proof shifts, at that Step, to the Commissioner. [T. 23].  At Step Five, the ALJ reported the findings of the VE, that a younger individual of forty-four (44) years of age, who had a college education and the same past relevant work and RFC as the Plaintiff, could work as a general office clerk, of which there were 18,000 positions in the State of Minnesota.  Id.  The ALJ concluded that the Plaintiff was capable of performing other jobs, which existed in significant numbers in the national economy.  Id.

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time prior to January 17, 2003.

## IV.  Discussion

A.      Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002);

Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890

(8th Cir. 2001). Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision." Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we

- 52 -

will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.   See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

   B.   Legal Analysis. In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

   1.   That the RFC Determined by The ALJ was Incorrect;

   2.   That the ALJ Failed to Give Substantial Weight to the Plaintiff's Treating  Physician;

   3.   That the Hypothetical to the VE did not Include All of the Limitations Supported by the Record; and

   4.   That the ALJ Failed to Notify the Plaintiff about the Effect of Res Judicata in his Hearing Notice.
See Plaintiff's Memorandum, Docket No. 12, at 5.

We address each contention below.

   1.   Whether the RFC Determined by the ALJ Was Incorrect.

- 53 -

a.   <u>Standard of Review</u>.   The governing law makes clear that credibility determinations are initially within the province of the ALJ.  See, <u>Driggins v. Bowen</u>, 791 F.2d 121, 125 n.2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, <u>Shelton v. Chater</u>, 87 F.3d 992, 995 (8th Cir. 1996); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990).  These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  See, <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by <u>Polaski v. Heckler</u>, supra, and its progeny.  See, e.g., <u>Flaherty v. Halter</u>, 182

- 54 -

F. Supp. 2d 824, 829 (D. Minn. 2001); <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir.

1996); <u>Shelton v. Chater</u>, supra; <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996).

Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective

symptoms, include the Plaintiff's prior work record and the observations of third

parties, and of physicians, concerning:

      1.     the claimant's daily activities;

      2.     the duration, frequency, and intensity of the pain;

      3.     precipitating and aggravating factors;

      4.     dosage, effectiveness and side effects of medication; and

     5.     functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006)(listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. See, Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. See, Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general

- 56 -

physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied. For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling. See, Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.

Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997); <u>Chamberlain v. Shalala</u>, supra at 1494; cooking, <u>id.</u>; doing yard work, <u>Swope v. Barnhart</u>, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, <u>Johnson v. Chater</u>, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. See, <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996).

b. <u>Legal Analysis</u>. In arriving at his RFC, the ALJ found significant inconsistencies between the Plaintiff's subjective complaints and the Record as a whole. Guided by <u>Polaski v. Heckler</u>, and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of his impairments, to be undermined by his medical records, and by the assessments of the ME, and by the other medical consultants.

In discounting the Plaintiff's testimony, the ALJ referenced medical evidence in the Record that related to the Plaintiff's complaints. Specifically, the ALJ cited to the ME's Hearing testimony, and to evidence taken from the Plaintiff's treatment history at the VA. [T. 20]. The ALJ noted that therapy records, from the Fall of 2002 until the date of the Hearing, indicated that the Plaintiff experienced mood swings, but

- 58 -

remained functional, and that, on September 9, 2002, the Plaintiff's reported that his mood was stable, with depressive symptoms only about half of the time, and that he was utilizing skills he had learned in therapy to deal with those depressive episodes. Id.

In addition, the ALJ considered evidence in the Record which pertained to the Plaintiff's reaction to stress, as a precipitating factor for his depression. The ALJ found evidence to support the Plaintiff's claim that his symptoms worsened under stress, as when his original DIB claim was denied in November of 2002, but also determined that, later that same month, the Plaintiff reported that he was coping better. Id. The ALJ also found credible the Plaintiff's claim that he reacted with sleep disruption, irritability, and diminished energy and concentration to the stress of blending families with his new wife, suffering financial problems, relocating from St. Paul to Litchfield in the Summer of 2003, and coping with his teenaged son's admission into drug treatment. Id. The ALJ noted that, as a result of those stressors, in June of 2003, the Plaintiff had considered seeking day treatment for his symptoms, but was ultimately able to handle his stress without additional medication or treatment, and reported a few weeks later that he felt much better. [T. 20-21].

The ALJ also considered the Plaintiff's mental health records from his treatment at the VA.  [T. 21].  While finding that "anger is clearly a problem" for the Plaintiff, the ALJ found that there was no evidence in the Record that his anger resulted in physical abuse toward any member of his family, or caused problems in superficial social interactions, such as while shopping for food, or attending church services.  Id.  The ALJ determined that, despite the fact that the Plaintiff testified that he had recently been having thoughts of harming animals and his family, there was no evidence in the Record to reflect that he had discussed any of these symptoms with Dr. Pardo, or sought treatment for them.  Id.  In fact, the ALJ noted that the Plaintiff reported that his communication skills had been improved by his treatment.  Id.  The ALJ likewise considered the opinion of a consulting psychiatrist, who  found that the Plaintiff appeared mildly depressed and anxious, but was otherwise pleasant and cooperative.  Id.  The ALJ did not completely discount the Plaintiff's credibility, and relied on his testimony, as well as evidence in the Record, in limiting the Plaintiff's RFC to no more than brief and superficial contacts with co-workers, supervisors, and members of the public.  Id.

The ALJ also considered the Plaintiff's overall symptomatology, and reduced his RFC to simple and unskilled work so as to accommodate any limitations that the

Plaintiff experienced in concentration.  [T. 21].  The ALJ acknowledged that the Plaintiff had reported to one of the consulting physicians that he had feelings of fleeting suicidal thoughts, as well as brief episodes of hypomania that lasted a few days, and were followed by episodes of depression, and panic attacks, five (5) or six (6) times a month.  Id.  The ALJ found that Dr. Pardo had treated those symptoms with several mood stabilizing medications, and that the Plaintiff had reported that those medications were beneficial in stabilizing his moods.  Id.  The ALJ also weighed the Plaintiff's daily activities, and found that they included using a computer and sending e-mail, playing the guitar, and driving a car, as well as being the responsible parent for the three teenaged children who lived with him.  [T. 22].  In addition, the ALJ noted that the Plaintiff occasionally operated a ham radio, talked to his friends on the telephone, watched television, read, did crossword puzzles, and visited his mother in Des Moines several times a year.  [T. 19].

While acknowledging that the decision was not binding on him, the ALJ also considered the VA Rating, which determined that the Plaintiff was 100% disabled from PTSD.  [T. 21-22].  The ALJ noted that VA records indicated that the Plaintiff had a mental impairment that resulted in mood swings, irritability, and a diminished capacity for stress, and he reduced the Plaintiff's RFC accordingly.  [T. 22].  A s   a

final matter, the ALJ considered the effect of the Plaintiff's noncompliance with treatment, as it was disclosed in the Record, and noted that, in April of 2003, the Plaintiff reported feeling better since beginning regular treatment, but admitted to missing his medications up to one-third (1/3) of the time.  [T. 21].  Further, the ALJ found evidence in the Record, that reflected that Dr. Pardo had advised him that his moods would likely stabilize if he were more compliant, and noted that, by September of 2003, the Plaintiff reported that he was taking his medications as prescribed, and denied any symptoms of depression.  The ALJ concluded that, although the Record did not support a finding that the Plaintiff suffered any side effects from his medication, at the Hearing, the Plaintiff complained of a hand tremor and, for that reason, the ALJ eliminated jobs requiring fine detail work from the Plaintiff's RFC. Id.

The Plaintiff contends that the ALJ failed to follow the requirement of Social Security Regulation 82-59, and therefore, erred in his evaluation of the Plaintiff's history of non-compliance with prescribed treatment.  See, Plaintiff's Memorandum, supra at 61.  Social Security Regulation 82-59 establishes that an individual "who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source," which the State Agency

determines would restore the individual's ability to work, cannot be found to be under a disability solely for that failure to comply.  See, Social Security Regulation 82-59; see also, Waggoner v. Chater, 81 F.3d 171 at *1 (9th Cir. 1996)(Table Decision) (Social Security Regulation 82-59 applies only to claimants who would otherwise be disabled within the meaning of the Act); Roberts v. Shalala, 66 F.3d 179, 183 (9th Cir. 1995).  The ALJ is charged with making the determination that a prescribed treatment would  be expected to restore a claimant's ability to work.  Id.; see also, Sivilay v. Commissioner of Social Security, 32 Fed. Appx. 911, 914 (9th Cir. 2002)(ALJ must specifically find that treatment would restore claimant's ability to work).

Notably, in Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001), our Court of Appeals explained that "Social Security Ruling 82-59 only applies to claimants who would otherwise be disabled within the meaning of the Act," and thus, "does not restrict the use of evidence of noncompliance for the disability hearing." See also, Qualls v. Apfel, 209 F.3d 1368, 1372 (10th Cir. 2000); Tassel v. Apfel, 176 F.3d 485 at *1 (9th Cir. 1999)(Table Decision).  In Holley, the Court upheld an ALJ's use of a Plaintiff's non-compliance to weigh the credibility of his subjective complaints of pain, and found that such a weighing did not invoke Social Security Ruling 82-59. Holley v. Massanari, supra at 1092.  Here, as in Holley, the ALJ did not consider the

- 63 -

Plaintiff's compliance to assess whether compliance would have restored his ability to work, but rather, he weighed that evidence solely in evaluating the Plaintiff's believability. Accordingly, Social Security Ruling 82-59 does not apply, here, and the ALJ did not err in considering the Plaintiff's history of non-compliance in assessing his credibility, or in finding that the Plaintiff's testimony was not supported by the substantial weight of the Record.

In sum, "[w]here adequately explained and supported," as we find to be the case here, "credibility findings are for the ALJ to make." <u>Dukes v. Barnhart,</u> 436 F.3d 923, 928 (8th Cir. 2006), quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000). As a consequence, "[b]ecause the ALJ was in a better position to evaluate credibility, we defer to his credibility determinations as long as they were supported by good reasons and substantial evidence." <u>Cox v. Barnhart</u>, --- F.3d ---, 2006 WL 3751503 at *5 (8th Cir., December 22, 2006), citing <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

    2.    <u>Whether the ALJ Failed to Give Substantial Weight to the Plaintiff's Treating Physician.</u>

        a.    <u>Standard of Review</u>. When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable

medical sources" -- the opinion of a treating physician must be afforded substantial weight.  20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole.  See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, Rogers v.

Chater, supra at 602; Ward v. Heckler, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  Id.  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole."  See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the

knowledge that the medical provider has about the claimant's impairments.  See, <u>20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii)</u>.  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.   See, <u>20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1)</u>.

        b.    <u>Legal Analysis</u>. The Plaintiff argues that the ALJ failed to afford proper weight to the opinion of the Plaintiff's treating physician, Dr. Pardo, when he relied upon the testimony of the ME, the State Agency's consulting physicians, and a consultative examiner.  We disagree.

     As previously noted, the ALJ need not give any weight to a treating physician's conclusory statements regarding total disability.  See, <u>20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1)</u>; <u>Rogers v. Chater</u>, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the treating physician's opinion.  See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846. Here, the ALJ found that Dr. Pardo's conclusion, dated April 13, 2004, [T. 464-66], that the Plaintiff was seriously limited, or entirely lacking, in the ability to function in several crucial areas

related to employment, was not supported by the substantial evidence in the Record as a whole.  [T. 22].

In his assessment of the Plaintiff, Dr. Pardo concluded that the Plaintiff had no useful ability to function in the areas of: judgment; dealing with work stress; maintaining attention or concentration; understanding, remembering, and carrying out complex job instructions; understanding, remembering, and carrying out detailed, but not complex, job instructions; maintaining his personal appearance; behaving in an emotionally stable manner; relating predictably in social situations; and demonstrating reliability.  [T. 465-66].  Dr. Pardo supported these assertions by simply noting that the Plaintiff had not been hospitalized since he ceased working, [T. 465], and that the Plaintiff's social impairments were at least partially as a result of his non-compliance with his prescribed medications, which he attributed to the severity of the Plaintiff's mental illness.  [T. 466].

The ALJ considered that opinion, but also found that, during the time period in question, the Plaintiff was the responsible father to several teenaged children, had negotiated selling his home and purchasing a new home, and had moved his blended family to a new city, all of which indicated his ability to exercise judgment on a daily basis.  [T. 22].  The ALJ also considered Dr. Pardo's assertion that the Plaintiff had

no ability to tolerate stress, or to concentrate.  Id.  While noting that the Plaintiff's symptoms worsened under stress, and that he often spent his "bad days" in bed, the ALJ found that the testimony was contradicted by evidence in the Record that the Plaintiff regularly used a computer, sent e-mails, played the guitar, and drove a car. Id.  The ALJ did not disregard Dr. Pardo's reports, as he noted that he considered the doctor's assessment of the Plaintiff's diminished capacity for concentration, and the ability to handle stress, by reducing the Plaintiff's RFC so as to encompass only simple and unskilled work.  [T. 21].

In declining to give controlling weight to Dr. Pardo's opinion, the ALJ specifically adopted the opinion of the ME.  [T. 20].  In doing so, the ALJ noted that the ME was a clinical psychologist, had the benefit of reviewing all of the evidence presented, and was trained and experienced in evaluating mental impairments in the context of SSA Hearings.  Id.  The ALJ also found that the ME's opinion was supported by the conclusions of the consulting physicians, as well as by the Record as a whole.  Id.  As a consequence, we find that the ALJ fulfilled his responsibilities

under the Regulations, by explaining the weight that was given to the ME's opinion. See, 20 C.F.R. §404.1527(f)(2)(ii).[12]

The Plaintiff argues that the ME's opinion was not entitled to controlling weight, because the ME did not have an opportunity to review Dr. Pardo's report of April 13, 2004. See, Plaintiff's Memorandum, at p. 45. While it does not appear in the Record, that the ALJ sent the ME a copy of Dr. Pardo's assessment for review, we cannot find that circumstance to be a serious omission. Throughout his testimony at the Hearing, the ME stated that he was able to form a reliable medical opinion, concerning the Plaintiff's condition, based upon the evidence in the Record. The Plaintiff's counsel also advised, at the Hearing, that, except for the most recent VA Rating letter, the Record was complete, and contained all of the Plaintiff's pertinent medical history. [T. 505]. Although, as the Plaintiff urges, the ME did testify that he felt that medical evidence was "lacking," that statement was made in the context of his consternation about the lack of evidence, in the Record, supporting the Plaintiff's claimed PTSD, which was not addressed in Dr. Pardo's assessment of April 13,

---

[12]We note that the Plaintiff also alleges that the ALJ erred in relying on the testimony of the State Agency consulting physicians but, as the ALJ did not ascribe controlling weight to those opinions, and thoroughly justified his reliance on the ME's opinion by referencing the evidence in the Record, we do not find any reversible error in this respect. See, Plaintiff's Memorandum, at p. 47.

2004.[13]  While it would have undoubtedly been preferable for the ALJ to submit Dr.

---

[13]We do not overlook the fact that the Plaintiff's counsel transmitted to the ALJ, along with Dr. Pardo's assessment of April 13, 2004, a copy of a rating decision, which is dated March 8, 2001, and which increased the Plaintiff's disability rating from 30% to 100%, on the basis of the PTSD.  [T. 463].  As the ALJ correctly noted, that evaluation relied upon medical records which predated the Plaintiff's onset date of disability, and pertained to the period in which the Plaintiff had previously been determined to be not disabled under the Social Security laws.  Subsequently, the Plaintiff's counsel transmitted a disability rating, from the VA, that is dated May 24, 2004, and which continued the Plaintiff's disability rating at 100%.  [T. 468-473].  While the ALJ does not specifically reference the latter disability decision, the decision expressly relies upon Dr. Pardo's examination dated April 30, 2004, and many of the bases for an 100% disability rating were discredited by the ALJ, or were incorporated in the ALJ's RFC.  As a result, we find nothing in the Plaintiff's post-Hearing submissions that fatally undermine the ALJ's decision.

Nor can it be responsibly stated that the ALJ did not give proper consideration to the VA's disability rating.  While "a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits," such determinations "are entitled to some weight and must be considered in the ALJ's decision."  Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998), citing Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996), and Wilkins v. Callahan, 127 F.3d 1260, 1262 (10th Cir. 1997).  Here, the VA's rating, and the bases for that rating, were not ignored by the ALJ, but were considered and assessed in the light of the whole Record.  While we acknowledge some facial inconsistency, which arises when the VA rates an individual as being totally disabled, yet the same individual is denied Social Security benefits, the basis for different rulings can be explained by differences in the record, and opinions presented, or by differences in the purposes served by the differing standards of disability ratings.  Here, the Record supports the ALJ's assessment of the Record presented, and the ALJ did not ignore, but rather, fully considered, the VA's rating of the Plaintiff.  Cf., Lacewell v. Barnhart, 123 Fed.Appx. 243, 245 (8th Cir. 2005)(affirming a denial of Social Security benefits, notwithstanding a contrary VA disability award).

- 71 -

Pardo's assessment to the ME, given our conclusion that the assessment was conclusory, and shed little substantive light on the Defendant's mental state, we find that the ME had access to all of the Plaintiff's treatment records, and that his failure to review Dr. Pardo's evaluation, does not constitute reversible error.[14]

We are mindful that conflicts in the medical record confronted the ALJ, and the conflict involved competing opinions by a treating physician, and of consultative medical experts.  In Cox v. Barnhart, 345 F.3d 606, 608-609 (8th Cir. 2003), our Court of Appeals reversed a District Court's affirmance of an ALJ's determination to deny benefits, where the determination discredited the opinions of the claimant's treating physician.  There, however, the treating physician's opinions were consistent with substantial evidence in the Record as a whole, which is not the circumstance here.  Where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, including [the ME's testimony], weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various

---

[14]The Plaintiff also alleges that the ALJ had an obligation to contact Dr. Pardo in order to clarify any ambiguities in his letter of April 13, 2004, before giving controlling weight to the ME's testimony.  See, Plaintiff's Memorandum, at p. 45. However, the ALJ did not find that Dr. Pardo's letter was ambiguous, or required clarification, but only that it was not supported by the weight of the evidence in the full Record, and consequently, he was not required to contract Dr. Pardo.  See, 20 C.F.R. §§404.1512(e)-(e)(1).

conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345

F.3d 661, 667 (8th Cir. 2003).   After close review, we are satisfied that the ALJ

properly weighed the medical opinions in the record, and afforded those opinions the

weight they deserved when considered on the Record as a whole.  See, Bentley v.

Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts

among 'the various treating and examining physicians.'"), quoting Cabrnoch v.

Bowen, 881 F.2d 561, 564 (8th Cir.1989).

      3.     Whether the ALJ Correctly Formulated the Hypothetical for the VE.

      a.     Standard of Review.  It is well-established that a hypothetical

question must precisely set out all of the claimant's impairments that the ALJ accepts

as supported by the Record.  See, Hallam v. Barnhart, 2006 WL 3392179 *2 (8th Cir.,

November 27, 2006)(ALJ must include in hypothetical those limitations that he finds

consistent, credible, and supported by record as whole); Lacroix v. Barnhart, 456 F.3d

881, 889 (8th Cir. 2006); Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  "A

hypothetical question posed to the vocational expert is sufficient if it sets forth

impairments supported by substantial evidence in the record and accepted as true."

Goff v. Barnhart, supra at 794, quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir.

2001), in turn citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000); see also,

Grissom v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005).  "A proper hypothetical

question presents to the vocational expert a set of limitations that mirror those of the

claimant."  Harwood v. Apfel, 186 F.3d 1039, 1044 (8th Cir. 1999), citing  Hutton v.

Apfel, 175 F.3d 651, 656 (8th Cir.1999).  The hypothetical does not need to include

medical terminology from the Record, but should capture the "concrete consequences"

of the supported impairments.  Lacroix v. Barnhart, supra at 889, citing Roe v. Chater,

92 F.3d 672, 676-77 (8th Cir. 1996); see also, Gill v. Barnhart, 2004 WL 1562872 *7

(D. Neb., July 13, 2004); Hunt v. Massanari, supra at 625.

   b.   Legal Analysis.  The Plaintiff alleges that the ALJ should not have

relied on the VE's testimony, because it was based on a flawed hypothetical that failed

to capture the concrete consequences of the Plaintiff's alleged disabilities.  See,

Plaintiff's Memorandum, at p. 67.  Specifically, the Plaintiff alleges that the ALJ

failed to include evidence in his hypothetical that the Plaintiff has "good days," on

which he is capable of working, and "bad days," in which he suffers from severe

depression, and that it is impossible for the Plaintiff to predict when a bad day will

occur.  Id. at 65.

   As previously noted, however, the ALJ is only required to include, in his

hypothetical, those impairments that he finds to be supported by the Record.  See,

Lacroix v. Barnhart, supra at 889.  At the Hearing, the ALJ asked the Plaintiff about

evidence in the Record that showed that some days, the Plaintiff appeared to be "doing

real well." [T. 494].  The Plaintiff acknowledged that he had good days and bad days,

and he admitted that, in the past, he had done well for as long as a week, and that he

continued to have stretches of time in which he did not suffer from depressive

symptoms.  Id.  Based on that testimony, as well as other evidence in the Record, the

ALJ crafted his hypothetical to assume that the individual would work in a low to

moderate stress environment, with only superficial contact with his fellow employees,

supervisors, and the public, and involving no fine detail work.  [T. 517].

In response, the VE testified that she considered the limitations, which were set

forth in the hypothetical, and that jobs were available in the regional economy that

satisfied those assumed restrictions.  Id.  The ALJ then asked the VE if the individual

could remain employed if he missed work one (1) day a week, and she stated that he

could not.  [T. 518].  The Plaintiff's counsel then asked the VE if the individual could

sustain employment, if he were forced to miss work two (2) days a month, and she

responded that he could.  [T. 519].  While, as the Plaintiff argues, the VE did testify

that a person who was required to miss work one (1) day a week would not be

competitively employable, that condition was not included in the ALJ's hypothetical,

- 75 -

and so the VE's response was not substantive evidence that the Plaintiff was not competitively employable.

We conclude that the assumptions, which were employed by the ALJ in proposing a hypothetical to the VE, properly included those restrictions on the Plaintiff's functional capacities that were consistent with the Record as a whole, and we find no reversible error on this score.

    4.    <u>Whether the ALJ Failed to Inform the Plaintiff of the Effect of Res Judicata in his Hearing Notice</u>.

    a.    <u>Standard of Review</u>. "Absent a colorable constitutional challenge, federal courts generally do not have jurisdiction to review refusals to reopen claims for disability benefits." <u>King v. Chater</u>, 90 F.3d 323, 325 (8th Cir. 1996); see also, <u>Piepgras v. Chater</u>, supra at 237 ("We have no jurisdiction to review the Appeals Council's non-final decision to deny review."), citing <u>Browning v. Sullivan</u>, 958 F.2d 817, 822-23 (8th Cir.1992); <u>Grove v. Barnhart</u>, 382 F. Supp.2d 1104, 1106 (S.D. Iowa, 2005); <u>Attia v. Barnhart</u>, 306 F. Supp.2d 895, 899 (D.S.D. 2004), aff'd, 108 Fed. Appx. 424 (8th Cir. 2004), citing <u>Califano v. Sanders</u>, 430 U.S. 99, 107-09 (1977)("As a general matter, federal courts do not have jurisdiction to review the Commissioner's refusal to consider one or more issues on res judicata grounds or to reopen a prior

application because the same is not a 'final decision' within the meaning of §205(g).").  However, our Court of Appeals has recognized that a Federal Court will have jurisdiction where a claim has been "constructively reopened," by reconsideration on the merits as a matter of administrative discretion.  See, King v. Chater, supra at 325, citing Jelinek v. Heckler, 764 F.2d 507, 508 (8th Cir. 1985).

Due process requires that applicants for DIB must receive an opportunity to be heard "at a meaningful time and in a meaningful manner," and must also receive timely and adequate notice of the Hearing.  Herts v. Smith, 345 F.3d 581, 587 (8th Cir. 2003), citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965); see also, Crum v. Missouri Dep't of Revenue, 455 F. Supp. 2d 978, 987 (W.D. Mo. 2006), citing Goldberg v. Kelley, 397 U.S. 254, 267-68 (1970).  "[W]ithout meaningful notice of the possible application of res judicata, an applicant's due process rights have been violated."  See, Rodriguez v. Massanari, 2001 WL 406226 at *5 (N.D. Tex., April 17, 2001); see also, Kapp v. Schwieker, 556 F. Supp. 16 (N.D. Calif. 1981); Broome v. Heckler, 562 F. Supp. 868 (W.D.N.C. 1983); Walje v. Shalala, 1994 WL 477254 (D. Kan., August 1, 1994).  The Regulations require that  a Notice of Hearing be mailed twenty (20) days prior to the Hearing, and include a statement of the specific issues to be decided.  See, 20 C.F.R. §§404.938(a)-(b).

b.    <u>Legal Analysis</u>.  The Plaintiff makes the curious argument that the ALJ violated his right to procedural due process, because the Notice of Hearing did not explain the potential impact of <u>res judicata</u> on his claim.   See, <u>Plaintiff's Memorandum</u>, at pp. 58-59.    Notably, the Plaintiff does not assert that he was provided legally inadequate notice of his right to appeal from the earlier decision which denied him benefits, or that he was not apprised of the potential significance in filing a new application for benefits, as opposed to appealing the earlier adverse ruling.  See, e.g., <u>Yeazel v. Apfel</u>, 148 F.3d 910, 911-12 (8th Cir. 1998); see also, [T. 27-28](explaining the Plaintiff's right to appeal, and the distinctions between appealing an adverse decision, and filing a new application for benefits).  Rather, the Plaintiff maintains that he did not receive notice that the earlier denial of benefits could by legally binding on his new application.  We find the argument curious, because it ignores the specific provisions contained in the pertinent Notice that was provided to him.

The Notice sent to the Plaintiff referred to the time of the Hearing, the consequences of failing to appear, described the primary issues to be considered at the Hearing, and included the following statement:

> An additional issue to be considered is whether the decision entered on November 4, 2002, in connection with your application(s) filed March 29, 2001, is final and binding under sections 404.955 and 416.1453 or is subject to reopening and revision under section 404.987 and 416.1487 of the Social Security Act, as amended.

[T. 73-75].

While the notice did not contain the legal term "res judicata," we have no reason to believe that the incorporation of that term was either needed, or would be preferable to the plain language that was expressly incorporated into the Notice that the Plaintiff received.

We would have to be oblivious to the Record before us in order to join in the Plaintiff's assertion that the Notice did not "raise the issue of res judicata or how it could adversely impact his present claim."  In point of fact, notwithstanding the Plaintiff's disregard of the language of the Notice he received, his legal counsel, within about two (2) weeks after receiving that Notice, formally requested a reopening of the Plaintiff's previous application for benefits, see, T. 138, which the ALJ obviously denied.  Without question, the Notice the ALJ served upon the Plaintiff had its intended effect, at least as pertinent here, in alerting counsel for the Plaintiff to the potential that administrative res judicata could impact upon the Plaintiff's second application for benefits, unless the earlier decision was reopened.  Under Eighth

- 79 -

Circuit precedent, we have no jurisdiction to review the denial of the Plaintiff's request to reopen the earlier denial of benefits to the Plaintiff.  See, <u>Bladow v. Apfel</u>, 205 F.3d 356, 361 n. 7 (8th Cir. 2000), citing <u>Robbins v. Sect'y of Health and Human Services</u>, 895 F.2d 1223, 1224 (8th Cir. 1990).  While the ALJ did consider evidence that predated the alleged onset date for the Plaintiff's second claim for disability, there was no error in doing so where, as here, "the prior medical evidence would serve as a background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding."  <u>Id.</u>, quoting <u>Robbins v. Sect'y of Health and Human Services</u>, supra at 1224.

Contrary to the Plaintiff's argument, we find that the Notice provided to the Plaintiff fully satisfies the requirements of procedural due process, and complies with Social Security Regulations, which require that the Notice of Hearing inform the Plaintiff of the specific issues to be decided.  See, <u>20 C.F.R. §404.938(b)</u>.  Here, the Notice prompted a formal request, by the Plaintiff's attorney, to reopen the prior Hearing, and that request was denied.  We have no jurisdiction to review that denial, unless the denial is challenged on legitimate constitutional grounds, which the Plaintiff has not advanced here.

The Plaintiff suggests that <u>Harris v. Callahan</u>, 11 F. Supp. 2d 880 (E.D. Tex. 1998), supports his contention that the Notice of Hearing was inadequate.  There, a Court found that due process required meaningful notice of the application of <u>res judicata</u> to a claimant, who was mentally impaired, who did not recall having attended a prior Hearing, and who was not represented by counsel, because he did not understand that his previous claim would be an issue potentially covered at his second Hearing.  <u>Id.</u> at 882-84; cf., <u>Rodriguez v. Massanari</u>, supra at *5 (distinguishing <u>Harris</u>).  We find <u>Harris</u> to be inapposite, however, for a number of reasons.  Here, the Plaintiff was given explicit notice, prior to the Hearing, that the prior denial of benefits could be "final and binding," or "is subject to reopening and revision."  [T. 75].  Unlike the circumstances in <u>Harris,</u> the ALJ's Notice, here, was so effective as to have prompted the Plaintiff's request to reopen the prior decision, a request that was denied.  Moreover, here, the Plaintiff was represented by legal counsel during all aspects of the second Hearing, and by counsel who hold themselves out as "Your Social Security Disability Lawyers."  [T. 138].  In short, the Notice sent to the Plaintiff was timely, fair, and complete, and did not violate his right to due process.[15]

---

[15]The Plaintiff also suggests that his due process rights were violated because the Record of the prior claim was not included in the current Record, which prevented him from arguing against the application of res judicata at the Hearing.  See,

In sum, finding no error in the Record before us that warrants a reversal, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Cross-Motion be denied.

NOW, THEREFORE, It is —

---

Plaintiff's Memorandum, at p. 60.  However, at the opening of the Hearing, the ALJ explicitly mentioned the Plaintiff's previous claim, and advised that it would not be considered in the present case, and that the ALJ would be looking to the period on or after November 5, 2002, which was the day after the earlier denial of benefits.   [T. 476-78].  In her remarks which immediately followed that advisory, the Plaintiff's attorney makes no mention of any lack of documentation as to the Plaintiff's prior claim, nor does she register any argument to challenge the ALJ's determination not to reopen the earlier denial of benefits.  If there were a competent basis to warrant a reopening of the decision denying benefits, then the Plaintiff had ample time to fully argue the merits of a reopening, and he failed to do so.

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 11] for Summary Judgment be

denied.

2.      That the Defendant's Motion [Docket No. 19] for Summary Judgment

be granted.


Dated:  January 4, 2007                    *s/Raymond L. Erickson*
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties by no later than

**January 22, 2007**, a writing which specifically identifies those portions of the Report

to which objections are made and the bases of those objections.  Failure to comply

with this procedure shall operate as a forfeiture of the objecting party's right to seek

review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **January 22, 2007**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.